IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**YVONNE LONG**,                                                Civil Case No. 09-1022-KI

                    Plaintiff,

                                                                OPINION AND ORDER

        vs.

**COMMISSIONER,** Social Security Administration,

                    Defendant.


        Bruce W. Brewer
        419 5th Street
        Oregon City, Oregon  97045

                    Attorney for Plaintiff

        Dwight C. Holton
        United States Attorney
        District of Oregn


Page 1 - OPINION AND ORDER

Adrian L. Brown
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon  97204

David Morado
Regional Chief Counsel
Richard A. Morris
Special Assistant United States Attorney
Office of General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 221A
Seattle, Washington  98104-7075

       Attorneys for Defendant

KING, Judge:

Yvonne Long brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  I affirm the decision of the Commissioner.

## BACKGROUND

Long filed applications for SSI and DIB on March 30, 2006.  The applications were denied initially and upon reconsideration.  After a timely request for a hearing, Long, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on January 14, 2009.

On February 25, 2009, the ALJ issued a decision finding that Long was not disabled within the meaning of the Act and therefore not entitled to benefits.  This decision became the

final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on June 24, 2009.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability.  The claimant has the burden of proof on the first four steps.  Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920.  First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity."  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the Commissioner proceeds

to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work which he or she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his or her age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial

evidence and is based on correct legal standards.  Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1

(9th Cir. 2005).  Substantial evidence is more than a "mere scintilla" of the evidence but less than

a preponderance.  Id.  "[T]he commissioner's findings are upheld if supported by inferences

reasonably drawn from the record, and if evidence exists to support more than one rational

interpretation, we must defer to the Commissioner's decision."  Batson v. Barnhart, 359 F.3d

1190, 1193 (9th Cir. 2004) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ found Long met the insured status requirements, for purposes of her DIB

application, through December 31, 1991.  He found she suffered from cervical degenerative disc

disease and bipolar affective disorder.  However, the ALJ did not find that these impairments met

or medically equaled the requirements of any of the impairments listed in Appendix 1, Subpart P

of the Social Security Regulations.  He concluded that Long could perform light work, although

she could not perform overhead work with her left arm.  He also found her limited to unskilled

work, without general public contact.  The ALJ determined Long had no past relevant work, but

could perform other work in the national economy such as produce sorter, small products

assembler, and a paper sorter-recycler.

## FACTS

Long, born on July 13, 1966, alleges disability beginning in 1991, due to anxiety and

depression.  She subsequently developed neck, left shoulder, and upper back pain in August of

2006.

Page 5 - OPINION AND ORDER

Long completed the eleventh grade and has limited work history as a waitress and a mail clerk. She stayed home and raised two sons, one of whom was on SSI for mental retardation and the other of whom is autistic and hyperactive. It was the birth of the second son in 1991 to which she attributes her onset of anxiety symptoms. Long testified, "I pretty much care for the boys" and agreed that the "primary burden" is on her shoulders, since her husband worked out of the home. Tr. 46-47.

There are no medical records regarding Long's mental problems until 2002, and Long testified she had never been treated by psychiatrist until then. She saw a nurse practitioner right after her second son was born who prescribed Buspar for anxiety, but the medication did not agree with Long. A couple of years later, she saw Dr. John Clelan who prescribed an antidepressant, which also did not work. She did not see a counselor until she began treatment with James A. Farley, M.D. in August of 2002.

Dr. Farley diagnosed possible bipolar disorder, major depression, rule out possible pre-menstrual dysphoric disorder ("PMDD"), rule out possible learning disorder, and tobacco dependence. His records were not detailed until beginning with an April 2004 visit, in which Long described feeling "relaxed and peaceful" with an "ok" mood and "great" sleep. Tr. 197. On May 3, 2004, Long informed Dr. Farley that her niece had died suddenly and she described feeling distraught, anxious, and unable to sleep, and she had run out of Seroquel four or five days before. Supportive psychotherapy was helpful. Long was feeling better on July 12, 2004, although she had panic attacks when trying to sleep at night. On November 17, 2004, Long reported increased depression and anxiety related to her niece's death; she had run out of

Seroquel three weeks before.  In April 2005, she reported decreased anxiety and depression, and felt "great" with anxiety levels "under control with medicine" in October 2005.  Tr. 184.

Long reported to Dr. Farley in March 2006 that she had run out of her Depakote two weeks before, her fluoxetine three weeks before, her trazodone four to five days before, and her Seroquel two weeks before.  She experienced low moods and a marked increase in anxiety.

Just after this visit, Dr. Farley completed a mental status report, noting that Long was "alert, cooperative, on time, neatly dressed and groomed" but she suffered from "depressive symptoms" and "marked anxiety."  He diagnosed probable bipolar disorder with mixed episodes, possible PMDD and a possible learning disorder.  He noted Long frequently withdrew and isolated herself (with the exception of her immediate family) and had problems with consistency and pace.  He opined she had "very poor" concentration, persistence and pace.  Tr. 200-201.

In October 2006, Dr. Farley reported Long's situational stress due to her husband's illness, resulting in low moods and high anxiety.  "She has funtion[ed] adequately at times, but other times she has been [] withdrawn and unable to function."  Tr. 306.  However, she had also gone weeks without medications because of financial difficulties.  She continued to report high anxiety in April of 2007.  Her mood was better in February 2008, but she was experiencing higher anxiety levels; she had been off her medication for about two weeks.  Dr. Farley denied refill requests in September 2008 because he wanted Long to make an appointment first.  Dr. Farley reminded her about the need for regular appointments when he saw her in October 2008; Long reported stress at the deaths of her aunt and uncle, but that her mood was "good with the exception of depressive symptoms related to grief."  Tr. 322.

Long first experienced neck, left shoulder and upper back pain in August and September 2006.  She subsequently exacerbated the injury in November 2007 after lifting something heavy.  An MRI of Long's neck in February of 2008 showed early degenerative disc disease at C6-7.  No spinal stenosis or foraminal stenosis was found.  An annulus bulge was present.  Jeffrey Young, D.O., diagnosed chronic shoulder pain and cervical degenerative disc disease.  In October 2008, Gajanan Nilaver, M.D. evaluated Long's condition.  Long reported experiencing pain in the nape of her neck about nine months before, perhaps after lifting something heavy.  She first experienced left shoulder pain, which extended into her neck, but physical therapy helped.  She subsequently began experiencing pain as a result of her home exercise regimen.  She was taking Percocet, which helped with symptoms.  An August 2008 steroid injection provided "mostly complete relief of local pain and the usual pain running down the upper aspect of the arm."  Tr. 261.  She attended a pain clinic, with Oleg Maksimov, M.D., to assist her in managing her pain.

Long had also been diagnosed with restless leg syndrome, which was controlled "with good response" by Mirapex, Tr. 256, and asthma, also controlled by medication, Tr. 259.

## DISCUSSION

Long alleges the ALJ erred in the following ways:  he failed to consider the separate diagnoses of disc bulge with "nerve root involvement" and anxiety; he failed to properly consider her credibility; he failed to give Dr. Farley's opinion the weight to which it was entitled; he erred by not considering Long's husband's lay witness report; and he failed to perform a function-by-function analysis of Long's abilities and instead found her capable of light work; and, relatedly, the ALJ's limitation to unskilled work did not account for her concentration problems.

Page 8 - OPINION AND ORDER

I.    <u>Severe Impairments</u>

Long complains that the ALJ failed to consider the pain specialist's separate diagnosis of disc bulge with nerve root involvement.[1]  Dr. Maksimov opined, after reviewing the MRI, that Long's neck pain was most likely due to "internal disruption syndrome due to inflammatory involvement of C5-6 and C6-7 cervical discs" and "a C6-7 left sided disc bulge."  Tr. 246.

She also complains that the ALJ failed to consider her anxiety disorder.

The threshold at step two is a low one.  It is a "de minimis screening device [used] to dispose of groundless claims."  <u>Webb v. Barnhart</u>, 433 F.3d 683, 687 (9th Cir. 2005) (internal quotation omitted).

> A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities.  If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process.

Social Security Ruling 85-28.

Although Dr. Maksimov identified the disc bulge, neither he nor any other doctor noted any additional functional limitations that would be related to it, as opposed to the cervical degenerative disc disease.  Additionally, Dr. Maksimov concluded every visit with a statement that Long's pain was stable.  Long also fails to identify any additional functional limitations

---

[1]There is some discussion among the parties about whether this was evidence the ALJ had at the time of his opinion.  I note that Dr. Maksimov made the assessment after seeing the MRI at a November 2008 visit, which took place before the hearing.  Tr. 246.  Long's counsel provided these records to the ALJ prior to the hearing on December 8, 2008.  As a result, this was evidence the ALJ had in the record.

Page 9 - OPINION AND ORDER

associated with the disc bulge, as opposed to cervical degenerative disc disorder.  The ALJ did

not err.

As for the anxiety, Dr. Farley never diagnosed anxiety as a separate disorder.  He noted

anxiety as a symptom of the other diagnosed mental impairments:  bipolar disorder with mixed

episodes, possible PMDD, and rule out possible learning disorder.  As a result, Long does not

meet her burden of showing her anxiety is a separate medically determinable impairment.

Ukolov v. Barnhart, 420 F.3d 1002, 1005 (9th Cir. 2005) (objective findings required; symptoms

insufficient).

II.    Long's Credibility

Long testified that she became disabled in 1991 with the birth of her second son, when

she experienced an "all time high with my anxiety" and "it's gotten a lot worse" since then.  Tr.

35.  She described being confused, being up and crazy, and then being down and not functioning.

She estimated two good days a week where she could keep her house tidy and make dinner, and

five days of down moods where she sat on her bed with confusing and spinning thoughts.  She

also described injuring her shoulder and having ongoing pain in her neck since then.  She

estimated the pain at about a two or three with the medication.  She was unable to hold her two-

year-old niece because "once she leaves, I'm literally in bed, in pain for two to three days

afterwards."  Tr. 43.  Finally, when the ALJ asked her whether there was a reason she waited

until March of 2006 to file for benefits, she answered:

> No.  There's no reason at all.  I didn't think that it was a Social Security issue.  In
> 2006, my husband came down with a very rare disorder called Transverse
> Myelitis.  We tried to file for disability for him because he was unable to work for
> six months.  And at that time when I was taking, giving them information, they
> had asked me if I knew anybody else that could be disabled.  And at the time I

said, well you know, I've been depressed, and I have anxiety. And that's when they said, well let's take information from you. So that's when.

Tr. 47.

The ALJ found Long's statements only partially credible. He pointed out that although Long received treatment for her mental impairments, she delayed "obtaining any significant level of treatment for nearly a decade after her alleged onset date." Tr. 25. He found the routine, conservative nature of her treatment, which had worked to control her symptoms, undermined her testimony. He also noted the relatively infrequent trips to the doctor, missed appointments, and failure to comply with the regimen prescribed by her doctor.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. If there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony "only by offering specific, clear and convincing reasons for doing so." Id.

As an initial matter, the ALJ properly pointed out that there were no medical records referencing Long's mental impairments until 2002. Indeed, Long herself testified to the limited and sporadic treatment she had obtained for her anxiety and depression from 1991 until 2002.

Page 11 - OPINION AND ORDER

She did not see a psychiatrist, she did not see a counselor, she obtained Buspar from a nurse

practitioner right after her son was born and, when that did not work, she did not obtain an anti-

depressant until several years later.  This is a clear and convincing reason to find a claimant not

entirely credible.  Parra, 481 F.3d at 750-51 (evidence of conservative treatment is sufficient to

discount a claimant's testimony on the severity of an impairment).

       Additionally, the ALJ accurately characterized the medical record since 2002 and did not

employ cherry-picking tactics in evaluating it.  She saw Dr. Farley on only four occasions in

2004, two in 2005, two in 2006, once in 2007 and twice in 2008.  She generally reported good

moods and low anxiety when she was taking her medication, and reported feeling depressed and

anxious as a result of stressful situations, such as the unexpected deaths of her niece, aunt and

uncle, and her husband's illness.

       As for Long's daily activities, the fact that Long cared for two children who required a lot

as special-needs children, and testified that she did so almost entirely on her own because her

husband worked, tends to undermine her testimony about her inability to work.  See Rollins v.

Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

       In further support of his credibility finding, although insufficient on its own, is the fact

that Long waited as long as she did to file for benefits, and that she did so in conjunction with her

husband's application.

       Finally, although the Commissioner concedes the ALJ's statement is incorrect that Long

"often missed appointments and failed to comply with the medical regimen," the fact that the

ALJ improperly considered some reasons for finding plaintiff's credibility undermined does not

mean that the ALJ's entire credibility assessment is improper.  Batson, 359 F.3d at 1197.  I also

Page 12 - OPINION AND ORDER

note there is evidence in the record that Dr. Farley refused at least one time to refill prescriptions until Long made an appointment to see him, and that her symptoms worsened when she was unmedicated.

In sum, the ALJ did not err in finding Long's testimony only partially credible.

III.    ALJ's Evaluation of Dr. Farley

The ALJ rejected Dr. Farley's July 2006 opinion because it was conclusory and short, without explanation in support of his statements. Additionally, the ALJ pointed out that Dr. Farley's opinion was inconsistent with his own treatment records, which showed Long was upbeat when in compliance with her medications. Finally, Long's relapses were related to situational stressors, rather than her underlying mental condition.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. Lester, 81 F.3d at 830. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. Id. at 831.

The ALJ gave specific and legitimate reasons for finding Dr. Farley's opinion unpersuasive.  Dr. Farley offered no explanation in support of his conclusion that Long's concentration, persistence and pace was "very poor" or any examples in support of his assertion that she had experienced episodes of decompensation with family and friends.  An ALJ is not required to accept the opinion of a physician, even a treating physician, if the opinion is "brief, conclusory, and inadequately supported by clinical findings."  Batson, 359 F.3d at 1195. Additionally, the treatment records reflect that Long's condition was controlled when she was medicated and that her down periods were almost always associated with situational stressors or lack of medication.  The ALJ gave specific and legitimate reasons, supported by substantial evidence in the record, to reject Dr. Farley's opinion.

IV.    ALJ's Failure to Discuss Lay Testimony

The ALJ neglected to discuss Long's husband's written lay witness statement.  In that statement, Kenneth Long stated that he had known Long for twenty years, that she took their son to school, tidied the house and cooked and served dinner.  She could stay in bed for two days, tended to be forgetful, and had mood changes.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness.  A medical diagnosis, however, is beyond the competence of lay witnesses.  Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996).

> Where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1056 (9th Cir. 2006).

The Commissioner concedes that the ALJ failed to discuss Kenneth Long's statement. His statement, however, is almost identical to Long's written statement and, in fact, appears to have been written by Long herself. The handwriting is identical in both her statement and his. Furthermore, in her statement, in response to the question, "Do the illnesses, injuries, or conditions affect your sleep," she answered, "My brain will not let me relax, so I'm up almost all night." Tr. 126. In answer to a similar question about whether the disabled person's sleep is affected by the condition, Kenneth Long purportedly answered, "My body has problems relaxing and my brain won't shut down for sleep. Sometimes I can't sleep at all. I also sleep twelve hours." Tr. 134. He also purportedly answered, in response to a question about how long the disabled person could walk without stopping, "If I take it slow, I'm ok," and, in response to a question about how long the disabled person must rest before resuming walking, "When I can't breathe cause of asthma, 10 min after inhaler." Tr. 138. In response to a question about the disabled person following written instructions, he wrote, "Its confusing and my mind drifts on other thoughts." Id.

Normally I do not look kindly on the ALJ's failure to discuss lay witness testimony. Here, however, where the answers to the questions are almost identical to those given by Long, and when they appear to have been written by Long herself, I find I can confidently conclude that no reasonable ALJ could have reached a different disability decision.

V.    ALJ's RFC

Long raises two separate issues regarding the ALJ's RFC. She first asserts that his determination that she could perform light work skipped the step of analyzing her functional

abilities.  She separately argues that the ALJ failed to account for the state agency reviewing

psychologist's opinion regarding her moderate limitation in maintaining attention and

concentration.

> With regard to her first issue, Long points to SSR 96-8p, which directs:

> The RFC must first identify the individual's functional limitations or restrictions
> and assess his or her work-related abilities on a function-by-function basis,
> including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and
> 416.945.  Only after that may RFC be expressed in terms of the exertional levels
> of work, sedentary, light, medium, heavy, and very heavy.

> Mechanical application of this test is intended to ensure that the ALJ does not "overlook

limitations or restrictions that would narrow the ranges and types of work an individual may be

able to do, or find that the individual has limitations or restrictions that he or she does not

actually have."  SSR 96-8p.

> Here, however, the ALJ failed to offer an opinion as to Long's lifting, walking and sitting

limitations, but simply jumped straight to a conclusion that Long could perform light work.

"Light work" is defined to mean:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting
> or carrying of objects weighing up to 10 pounds. Even though the weight lifted
> may be very little, a job is in this category when it requires a good deal of walking
> or standing, or when it involves sitting most of the time with some pushing and
> pulling of arm or leg controls.  To be considered capable of performing a full or
> wide range of light work, you must have the ability to do substantially all of these
> activities.  If someone can do light work, we determine that he or she can also do
> sedentary work, unless there are additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

> The Commissioner fails to acknowledge that SSR 96-8p clearly prescribes the analysis

with which an ALJ must comply, and that the ALJ did not do so here.  Nevertheless, given my

Page 16 - OPINION AND ORDER

conclusions above that the ALJ's findings are supported by substantial evidence, and the fact that

Long has not identified any functional limitations supported by the record that are inconsistent

with the lifting, sitting and standing requirements for light work, I find the error is harmless.

Notably, the ALJ specifically accounted for Long's inability to perform overhead work with her

left arm.

Finally, the ALJ concluded Long was limited to unskilled work, without general public

contact.  Long contends the RFC did not account for the opinion of DDS psychologist, Frank

Lahman, Phd, that Long was moderately limited in her ability to concentrate.  He found,

however, that Long could understand, remember and carry out short, simple, routine tasks with

sustained concentration, persistence and pace.

Unskilled work is defined as simple work involving objects more than people, requiring

little or no judgment to do simple duties that can be learned on the job in a short period of time.

20 C.F.R. §§ 404.1568(a), 416.968(a); SSR 85-15.  Accordingly, the ALJ's limitation of Long to

unskilled work captured the limitations identified by Dr. Lahman.  The ALJ did not err.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and

the correct legal standards, and therefore the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

Dated this _____8th_____ day of February, 2011.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge


Page 17 - OPINION AND ORDER